Case number 163317, Anita Arlington Bay v. The City of Bedford Heights, Ohio, et al. Arguments not to exceed 15 minutes per side. Mr. Clymer, for the appellant, you may proceed. Good morning. If it pleases the court, my name is James Clymer, and I represent the appellants in this matter, and I've reserved two minutes for rebuttal. It appears to me and I would suggest to the court that the real matter at issue in this case is whether or not the defendants were deliberately indifferent to a risk of serious harm, an imminent and excessive risk of serious harm, to Mr. Arrington Bay when they arrested him and transported him and held him in the jail, pending a medical evaluation that they knew was coming when the nurse arrived in the jail at 6 o'clock, versus a different course of action, summoning medical assistance earlier. I would submit to the court that there is no constitutional violation here because there is no evidence that the officers and jailers involved actually recognized and appreciated an excessive risk of serious harm to Mr. Arrington Bay. Is that the test? Do you have to actually show that they admit that they appreciated the risk and ignored it? Isn't recklessness enough? I do not believe so. I believe the standard is criminal recklessness established in Farmer v. Brennan, which is essentially a conscious disregard of a risk of serious harm. My understanding is that the officers not only have to perceive the risk, but they also need to appreciate it. And this is one of those cases that is not like a broken arm or a broken leg, where the need is obvious. Well, I guess I think that's a great analogy, and I'm just not sure I know the answer to the point. I realize psychiatric problems aren't as obvious as a broken arm, particularly a compound fracture, but they never will be. There is no such thing as you don't bleed when you have a psychiatric problem like this. So you have an awful lot of indicators that this person was quite unwell, and they kept growing. They didn't shrink over time. They kept growing. And so I don't know. Your Honor, there were ambivalent signs. Yes, there is no question that Mr. Arrington Bay was observed babbling at times. His mother had indicated that he was bipolar. He had medication he wasn't taking, had not been taking, so that's reason for concern, right? And there were various stories about what that medication was for. At the same time, Mr. — I mean, I thought this was pretty well accepted, at least for summary judgment, that they knew he was on medication, had medication for psychiatric problems, and he'd not been taking it. I thought that was — we had to draw that inference from the record. They had been told that by Ms. Arrington Bay. They had been told by Mr. Arrington Bay that the medication he had on him was to help him sleep. Well, yeah, but that's what's called drawing the inferences in favor of the non-movement here at the plaintiff. I don't — We take the best evidence for them, right? I don't disagree, but I don't think that evidence is this positive. The real issue is whether this delay in treatment put Mr. Arrington Bay at excessive risk of harm. The officers and the jailers did know that medical assistance was coming. The question is, should they have taken a different course of action and gotten him treatment sooner? Now, Mr. Arrington Bay's behavior throughout this matter was back and forth. There is no — How long — I'm sorry to interrupt you, but I — Not at all. I lost the point you just made. How long did they anticipate, again, looking at the evidence in the light most favorable to the plaintiffs, how long did they think it was going to take before the medical treatment or the nurse would arrive? They knew that there would be a preliminary medical screening upon booking. Now, the booking was delayed somewhat because Mr. Arrington Bay was a little bit agitated when he came into the jail. It ultimately was carried out at about 3 o'clock or about 6 hours after he was brought into jail. At the time of the incident that led to his death, were they still anticipating some medical treatment or had they passed the point where if they were going to kind of order that for him, they would have? They had not. The preliminary medical screening occurred, to my recollection, about 3 o'clock in the afternoon. The actual confrontation in which Mr. Arrington Bay died occurred about 5 o'clock. The nurse was scheduled to come into jail at 6 o'clock. Who did this, quote, there was no medical screening at 3 then? There was a preliminary medical screening. But not by anyone connected to the medical profession? It was by a medically trained corrections officer. Does that mean nurse, or what does that mean? No. In the state of Ohio, corrections officers, in order to obtain their license, take a curriculum, and they do receive medical training in giving preliminary medical screenings to prisoners. And so that is not in and of itself medical treatment or necessarily a full medical assessment. But questions are asked concerning medical histories and psychiatric histories. And in that preliminary medical screening, Mr. Arrington Bay indicated that he had never before been treated for psychiatric issues. I will say I do not read the record as indicating that Mr. Bay's behavior progressed throughout the course of the day. At the scene, he was alternately babbling, he was cooperative, he was lucid, and he kind of went back and forth. When he went to the jail, there were a couple incidents in which he kicked the door to his cell, and he was yelling and screaming. He later indicated that he was unhappy, claiming that he had been trying to get the jailer's attention for about 30 minutes in order to go to the bathroom. When he went to the bathroom, it was necessary for some male officers to accompany him because he needed to be observed while he was in the bathroom. During that time, he did flash his genitals at the jailers. This is not unusual behavior in a jail. It's certainly unusual behavior in polite society or free society. This is not unusual behavior in the jail. After he went to the bathroom, Mr. Bay was calm, he was lucid, he thanked the officers, he returned to his cell, and there's no problem. I think the evidence also indicates that by the time 3 o'clock rolled around, when the shift changed, and he was given his preliminary medical screening, he was largely calm and quiet in most of his contacts, certainly with Officer Mudra, who did the preliminary screening. Officer Mudra noted that he was calm, asked him if he wanted to, after he screened him, put him back in his cell. He was then taken out to make a phone call. He was calm right up to the point that he asked where his cell phone was, and at that point... What do you say about this fact? When you look at our cases, when someone dies, they just tend to get to a jury. They tend to get past summary judgment in these type of deliberate indifference cases. Now, you could argue that's not legitimate. The question is not the extent of the injury. But you could also see the intuition behind the cases that, my gosh, if what ends up happening is a death, that seems to suggest there was something a little more wrong going on. Maybe you don't agree with me about the case law, but that would be my sense after 14 years on the court, that when there's a deliberate indifference case and there's a death, same thing with arrest situations and there's a death, they just seem to get to juries past summary judgment a little more often. I can't quite put my finger on why, but that just seems to be happening. Well, Your Honor, there's no question that deaths aren't supposed to happen in police custody and deaths aren't supposed to happen in jails. And we wish they wouldn't. But the fact of the matter is, at least in this context, the issue is whether that death occurred as a result of deliberate indifference or a conscious disregard of a known risk of imminent or excessive risk to that prisoner. And in this case, we would submit that there was not evidence that those officers appreciated or should have appreciated an imminent and excessive risk of harm to Mr. Arrington Bay by not summoning immediate medical assistance versus waiting for the nurse to see him. Setting aside the constitutional violation itself, the Supreme Court just a couple of weeks ago in White v. Pauley reminded us once again that clearly established law cannot be demonstrated by a general principle of law. It has to be with case law that preexists the incident that is factually aligned with the facts of the particular case. In this case, I have the greatest respect for Mr. Gilbert. I have the greatest respect for Judge Gaughan. But there is not a single case cited in either the summary judgment proceedings or the court's decision on summary judgment that is even remotely factually aligned with the facts of this case. Why is that? So these death cases entails, you're saying those are cases where what the guards were watching were problems that would really have shown usually a person being a risk to themselves, or that's the difference? I mean, because there were signs here. And here these signs weren't signs that would suggest the person would die, or these weren't signs that suggest the person would be seriously injured. I mean, there were signs. No question, there were signs. Is it a time issue that this was how many hours, six hours? I believe it was on the order of eight hours from the time they arrived to the jail. From the time they arrested him. Okay, so is that it? I mean, is that the comparison point, that none of them are eight hours or fewer? No, not at all. Not at all. Clark Murphy v. Forbach, cited by the court, involved a situation in which a prisoner was held in jail over about six days. He exhibited a lot of symptoms. It bears noting that the people who worked one shift were found to be entitled to qualified immunity in that case, but some of the people who were more involved with that prisoner were not. All of the people involved in this case worked less than one shift and had a limited time to view Mr. Arrington Bay and assess him. And, in fact, were operating on the knowledge that he would be assessed later on toward the end of the shift. Mr. Kleimer, if I may, as you talk about these cases, are you saying that they are not clearly established law for purposes of this case because the nature of the person's problem differed? Maybe it was a drug overdose or withdrawal from alcohol, or is it because of the length of time, or what is it generally? A number of different issues, Your Honor. I mean, there are substantial differences in the circumstances in which the public employees came into contact with the person. There were huge differences in the amount of information available. Some of the cases post-date this, and we know, of course, that clearly established law has to be established based on preexisting law. Did any involve bizarre behavior by the decedent? There was a lot of bizarre behavior involved in the other cases. That is the one common element, but I think that there are other factors that substantially distinguish all of those cases from this. Thank you. And I see that's all the time I have, if there are no questions. There are not. Thank you, Counselor. Thank you. May it please the Court, my name is Terry Gilbert. Chaplain Green. We represent the police, the estate of Omar Arrington Day. I'd like to reiterate the principle here in a qualified immunity appeal based on a summary judgment matter, is that all the inferences have to be drawn in favor of the non-moving party. I think that in this particular case, we have a situation where Omar, a 39-year-old man, had a history of mental illness, was diagnosed as bipolar, created a bizarre scene at Lowe's, where even the manager thought that he was mentally unstable. There are three components. There's the police that arrived at the scene and had interaction with him, where they discovered the pills. The mother was there who dropped him off and said, he has bipolar. There was reference to Seroquel, which is a treatment for bipolar. He hadn't been taking his medication. And at the scene, he had changed clothes, he was rambling, he was talking bizarre, he was talking about million-dollar cell phones, he was talking about his father being the son of the devil. I mean, incident after incident. What do I do with this reaction that, as a matter of law, everything that happened up to his death would not have predicted he would die? There's nothing that even remotely suggests that to me. Now, is that irrelevant, or is it relevant? Well, that is relevant. But the actual cause of death in this case was, in part, bipolar disorder, according to the medical examiner. They don't have to know the actual specific cause of the death. They have to know that there's a substantial risk here that people with psychiatric, acute psychiatric symptoms, which he was displaying, pose a serious risk, if not dealt with. A risk of harm. A risk of harm. And then the issue of whether there is a link between the harm and the actual death that occurred is a question of damages. All we have to show is a link, and we have done that. I mean, maybe my question is the same as Judge Sutton's, but what happens in a case where, let's say, the officer could and did perceive a serious risk of harm A and disregards it, and then after a few hours a totally different harm, harm B, happens? Let's say harm A is that he's going to engage in action which is going to trigger lethal force by the officers. That's harm A. Harm B is he's going to have a stroke and they don't do anything and they should have known that he might attack somebody and get shot. That doesn't happen, but he just has a stroke in his cell. Are the officers liable? If the signs are there of a risk of harm, they don't have to know the specific harm that may develop. He's saying, you know, I'm going, you guys come in my cell one more time. I'm going to, you know, do whatever it takes to tear your head off, to, you know, kill you, whatever. And they come in the cell and as they walk in, he has a stroke. I mean, are they liable? Well, in this case, this happened over nine hours later. But I'm asking in my hypothetical, are they liable in that hypothetical? Yeah, I mean, because. Don't you want to concede that that's a causation problem?  Well, I think Judge Kethledge is hypo. It doesn't sound like there's any, I mean, they're just different. Right, I mean, you're talking about physical danger to the staff. Okay, let's switch to this case. Did they have reason to fear that he might have a heart attack if they didn't get him to a hospital? No. And what do we do with that? All they knew that he, all they should have known and didn't do anything about was that he needed medical or mental health support. So what is the evidence? Here's where I'm struggling. What should we be looking at to say that they should have perceived that the fact that he needed some mental health help meant that he was at substantial risk of serious harm of whatever variety? Well, because the, first of all, the policies that they never learned about and the policies that they were never trained about go into extensive detail as to the importance of providing medical or mental health professional assistance to people who are exhibiting signs of this kind of behavior. And to immediately either take them to a hospital, an emergency room, or call the medical director or call a nurse who is not on duty. And none of these people were trained in the correctional setting. There's case law that says that they cannot avoid responsibility when they refuse to verify a particular problem. These officers knew that he was a risk. He was acting bizarre. He was eating food with his feet. He was yelling and screaming. He was kicking. He was out of control at various times. He was going to the bathroom and he was exposing and wagging his private parts. And they never thought for one moment to call a doctor or a nurse that was paid for by the city for these particular types of situations. And they just let it go and fester for so many hours until this particular incident happened. No one is asking them to analyze his mental health situation and try to figure out how to make a phone call and see what should be done. The medications were just put aside and not even documented. What about the reality? I mean, this is surely negligent. I mean, I guess that's the question. But what about the reality that a nurse was coming in, would be there at 6, an hour, as it turned out, after he died? No one, I don't think there is any indication in the record that they were going to call a nurse at any time. Okay, so maybe I'm misunderstanding the record. I thought what was going on is part of the reason for not calling is a nurse was scheduled to come in at 6. Is that wrong? Well, that's what counsel said. Okay, so what's the record say? But none of the, as far as I know, none of the eight people who were involved in this, the police officers or the various correctional officers said that, well, we think he has mental health problems and we're just going to wait until a nurse comes. And no one said it. Their claim was it was just typical abnormal behavior in a jail and they were going to put him in a holding cell and let him sit there. Does the record show that a nurse was going to come in at 6? Forget whether they explicitly relied on it. Does the record show that? I can't say for sure. I don't think it's relevant because he was in need of attention for about nine hours in an acute psychiatric, floridly as the expert we have looked at this, state. And they claim they didn't even know that he was in need of medical or mental health support. They try to, you know, shove this off as some kind of typical behavior in a jail rather than saying, okay, well, we think he may have a problem, but it's no big deal to wait for eight hours before the nurse comes in. That's not their defense. Their defense is that they saw all this bizarre behavior and didn't think it was necessary to do anything. And I think that's what Judge Gaughan repeatedly indicated in her 50 pages decision when she analyzed each and every issue of liability, raising a serious question that a jury can decide. Why should the arresting officers be exposed to liability here, given that they're taking the person to the jail? That's where the intake, that's where most of the medical stuff would happen. I don't think you're saying they should have driven him to the hospital, right? Well, first of all, they did not inform the jail staff when they brought him in. They informed them of some, but which ones are you referring to? Hans Ecker, for example, does not recall telling the jail staff what happened at the scene with the bipolar reference, with the pill reference. His behavior, about the situation at Lowe's. None of that was, you know, he didn't come in and say to the jailer, by the way, we arrested this guy, he was going crazy at Lowe's. He's on medication. I thought Lee, who was at the jail, knew about the incident at Lowe's. They only, Lee, all she knew was that...  Lee knew about the pills were found, but did not ask for what they were for. And they didn't, and she was supposed to do the booking and never did the booking. They just thought they had a combative person, but she admitted that there were... Let's just go back to the arresting officers. Your theory for them is they had a duty to give more information to the people at the jail. That's the deliberative indifference. Or they should have taken him, I mean, based on the behavior at the scene... Gone to the hospital? They should have taken him to an emergency room. I mean, this was not a major criminal offense. It was a misdemeanor. It was just breaking some... What's the case that you would cite that makes clear to an officer that based on those indicia, you must take this person to an emergency room? Well... I mean, one thing that does seem to be lacking somewhat here, as Mr. Clymer points out, is case law that shows that these officers should have known better than they did. I would say that Cooper, Horn versus Madison, Clark versus Murphy, Parsons versus Caruso... Which one's your best one, and why do you think those facts really map on to the ones here? We have a couple outside of the circuit cases. What's your best one inside the circuit that really, factually, would have given these officers pretty clear warning that they needed to take him immediately to the emergency room? That it's been the law in this circuit since 19... I can't point the best case, because every factual situation is different. Is there any case that occurs to you that you think really maps on to these facts? These particular facts? I mean, that really is the question, whether the law is clearly established. Well, since 1994, and I forgot the name of the case, and it's in the brief, the recognition that for pretrial detainees, or even people who are in prison, that psychiatric... psychiatric problems is considered under Farmer versus Brennan a serious medical condition. All right? I'm not trying to give you a hard time. I'm really trying to find out what case says that. If you don't know, that's okay. It seems to be a central part of the case. It's kind of like the dog that's not barking. Well, I don't... I just don't have the case right with me. But I think it's one of those cases that I just mentioned. There are various cases. They're all in the brief that acknowledge and have clearly established the principle that psychiatric conditions, mental health conditions, issues that are defined and knowledgeable by staff require intervention. You might think about this after argument. It's hard to remember everything in an argument, so maybe you can identify them after the argument. But one of the best cases on psychiatric illness is one I know pretty well, Clark. And that's a case where the guy just diminishes over three days. It's three days. And here we have nine hours, the signs are nowhere near as extreme as they were there. Clark establishes a rule, and that's clearly established. But to say that's the whole level of generality problem, to say that... Clark specifically says in that case that deliberate indifference could occur in one shift. I know the case. I'm telling you that that fact pattern is the fact pattern we have to use here. And that fact pattern is very far away. I'm not saying tell us today, but it's really important for the second prong of qualified immunity. Another thing that's troubling me here is that it seems as if, I think you just said a little bit ago, that these officers, these arresting officers, they saw this bizarre behavior. And they just thought they were dealing with somebody who was behaving bizarrely, as lots of prisoners do. Which totally undercuts a deliberate indifference claim, because for them to have been deliberately indifferent, they would have had to recognize that this guy was something more than just an obnoxious goof that they'd just arrested. They would have had to recognize that these are serious psychiatric symptoms. And then they would have had to ignore that recognition. They had that information, Judge. They had the fact that the mother told them that he had not been taking his medications. They found the pills on him. The mother didn't say go to the emergency room. Well, it's not up to her to say what should be done. They weren't given that kind of information. But they had enough information to believe and to be knowledgeable of the fact that this guy may be having a psychiatric episode. I mean, given what happened at Lowe's, given what happened at the car, the rambling, the bizarre ranting going on. Now, the police were only with him for, you know, an hour or so. They didn't give a lot of information when they dropped him off. But once he's in the jail, there were five correctional officers who saw this kind of behavior going on. And when he finally got to the emergency room, I mean, the preliminary screening, that guy didn't even note anything about his condition. He didn't even know anything about the pills. So each, you know, each one of these officers had the red flags right there that there was something wrong. No one bothered to do anything. Now, what could have happened after that, we don't know. But they had policies and procedures. And we won the Monell claim, by the way. And there's an extensive discussion of how completely indifferent the city of Bedford Heights was in training their people in the jail to deal with mental health issues, which is a major problem around the country. As our experts said, 20 to 40 percent of people who are pretrial detainees suffered from some kind of mental illness. They had no clue of what to do. They hadn't read the rules, they hadn't gone through any kind of training or updating, and yet they had these beautiful policies that nobody read. So when you put it all together, it just seems to me that this is a matter for a jury to determine, to determine whether or not there was sufficient risk that they should have intervened and done something. And that's all we're saying, is that the jury should be able to consider this. Thank you very much. Rebuttal. Thank you, Your Honor. At the tail end of Mr. Gilbert's argument, there was a reference to Monell issues. And I don't understand those to be at issue here. My understanding is the only issues are, number one, whether there was sufficient evidence of a constitutional violation, whether that constitutional principle was clearly established, and really, whether there is evidence to show that the officers here acted wantonly, recklessly, or willfully under Ohio law. In terms of the cause of death, there was some evidence that the coroner's verdict basically stated that the cause of death was an underlying cardiac condition in connection with bipolar disease or something to that effect. I understood it to be basically saying that the immediate cause of death was an underlying cardiac condition and contributed to by the bipolar disease.  So there is no dispute that the jail and the officers were in no way on notice of that cardiac condition. Yes. I mean, you don't make a proximate cause argument, I guess, right? I was not trying to make a proximate cause argument, but I did feel In the brief, I mean, I guess you're not arguing that there's a proximate cause problem because of this sort of mismatch between what harm might they have expected. Maybe he gets really beat up by the cops or the officers because he has an episode and he attacks somebody. We're not making that argument. As opposed to a heart attack. We're not making that argument, and I'm not sure it would be appropriate at this stage. I'm just trying to clarify what's on the table. Correct. I would also like to clear up any misconception there may be as to the duration of Mr. Arrington Bay's behavior. I think the evidence is very clear on the record that his behavior was not consistent throughout the day. And so, in other words, we don't have a screaming, ranting, raving prisoner for nine hours. The unrebutted testimony is he would have incidents in which he would act out, kicking the door, wanting to go to the bathroom. He would quiet down. He would yell some. He would quiet down. I don't know if that's very distinguishing. I think Clark is the same way. All I'm saying is that I think that that is a very different situation than had he been acting out nine hours straight. I don't think there are that many cases where people act out for nine hours straight. Thank you. The case will be submitted.